Janet PEARLSTEIN, Plaintiff,

v.

STATEN ISLAND UNIVERSITY HOSPITAL, Defendant.

No. 92–CV–3418 (JS).

United States District Court, E.D. New York.

April 28, 1995.

Thomas F. Bello, Santo Barravecchio, Thomas F. Bello, P.C., Staten Island, NY, for plaintiff.

Michael J. Volpe, and Domenique Camacho, Clifton Budd & DeMaria, New York City, for defendant.

*MEMORANDUM AND ORDER*

SEYBERT, District Judge:

In this action, plaintiff, Janet Pearlstein, alleges that her former employer, Staten Is-

land University Hospital (the "Hospital")[1] discriminated against her on the basis of gender in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), by eliminating her managerial position in the budget and reimbursement department of the Hospital's finance division. The Hospital claims that Pearlstein's position was eliminated because of budgetary problems and in connection with a consolidation and restructuring of the Hospital's finance division following the merger between Staten Island Hospital and Richmond Memorial Hospital (the "Merger"). Currently before the Court is the Hospital's motion for summary judgment.

### BACKGROUND

Pearlstein began working at the Hospital in June 1988 as Budget Manager. Pearlstein's responsibilities involved making recommendations on the Hospital's budget and budget process. She was initially responsible for supervising one employee, a statistical clerk. Pearlstein acknowledged in her deposition testimony that her position was at the lowest rung of the managerial ladder within the Hospital's finance division.

Until January 1989, Pearlstein reported to Dennis Hill, Director of Budget and Reimbursement. As a result of the Merger, in January 1989, Pearlstein began reporting to Lee Amato, the former Director of Budget at Richmond Memorial Hospital. Amato, in turn, reported to Hill. According to Hill's deposition testimony, one other woman, Laura Thompson, who prior to the Merger worked at the Richmond Memorial Hospital, continued to work in a managerial capacity within the budget and reimbursement department after the Merger.

In August 1989, Pearlstein informed Amato that she had decided to adopt a child that was to be born sometime in late September 1989. Pearlstein requested that Amato grant her an unpaid four-month leave to commence after the adoption. Pearlstein testified that she had requested this unpaid leave after concluding, through informal dis-

cussions with various colleagues at the Hospital and reading a Hospital manual, the title of which she could not recall, that such a leave was available to all of the Hospital's women employees. According to Pearlstein, Amato congratulated her after hearing her news and told her that she was free to take the leave.

On October 3, 1989, Pearlstein telephoned Amato at home and informed him that, because her adopted child was in the process of being born, her leave of absence would begin immediately. Pearlstein indicated that "he said that was fine. And that when I returned home after, you know, picking up my child, to come to the hospital and sign certain forms." (Pearlstein Dep. at 132.) It was Pearlstein's understanding that she would resume her position once her leave ended.

Pearlstein went to the Hospital on October 20, 1989 to sign the requisite forms and was informed by Amato that her leave had been approved and was asked when she would return to work. Pearlstein stated that she "would like the four month leave. February 5th I would like to return. He said, 'that's fine.'" (*Id.* at 138.) Until January 1990, Pearlstein did not again discuss her leave with her supervisors.

Hill testified at his deposition that Amato informed him in mid-August 1989 that Amato had granted Pearlstein a leave of absence to care for the child she was in the process of adopting. Upon hearing this plan, Hill had been "happy" for Pearlstein "because she was trying for so long to have a child." (Hill Dep. at 58.)

Pearlstein appears to have commenced her leave at a time when the Hospital's finance division was in a state of flux. Hill claims that in July 1989, he had contacted the Hospital's personnel department to discuss the effects of the Merger on the budget and reimbursement department. Hill asserts that he was concerned about the overlapping responsibilities among his managers, Amato, Pearlstein and Thompson. The personnel department, according to Hill, responded

---

1. Pearlstein was initially hired by Staten Island Hospital. The hospital's name was changed in 1990 to Staten Island University Hospital when a

merger between Staten Island Hospital and Richmond Memorial Hospital, commenced in 1987, was completed.

that his concerns regarding overlap were valid and would need to be addressed in the future.[2] According to a memorandum, dated January 28, 1990, prepared by Hill (the "January 1990 Memorandum"), Pearlstein's role was specifically considered at the July 1989 meeting; "[i]t was obvious that she no longer functioned in a managerial capacity (but her salary continued at a manager's level). It was agreed that a salary adjustment would not be made at the time, and that any appropriate adjustment would be made by reducing future pay increases."[3] (January 1990 Memorandum.) The memorandum also noted that since January 1989, when Pearlstein began reporting to Amato, her "overall responsibilities were reduced." (*Id.*) In his deposition testimony, Hill elaborated that the statistical clerk whom Pearlstein had originally been responsible for supervising had been transferred to another section of the finance division. Hill further testified that Pearlstein no longer met with executive staff and that her "[o]verall contact with outside departments started to get diminished."[4] (Hill Dep. at 75.)

Hill also asserted that in or prior to November 1989, to address this problem of overlap, Pearlstein's and Thompson's positions were changed from Budget Manager to Budget Coordinator and from Budget and Grant Manager to Budget and Grant Coordinator, respectively, while Amato's title was changed from Budget Director to Budget Manager. Without the change, Amato, who initially had the title of Director, would be reporting to Hill, who also had the title of Director, a result which the personnel department found confusing. When Amato assumed the title of Budget Manager, Pearlstein and Thompson

each assumed the title of Coordinator, still a managerial level position, in order to avoid a problem similar to that which existed between Amato's and Hill's former titles. It is unclear whether Pearlstein was ever informed that her title had been changed, as Hill asked Amato to notify Pearlstein but did not know whether Amato had done so.

In December 1989 and January 1990, the Hospital allegedly discovered that the effects of the Merger would cause a budgetary shortfall for 1990. Hill testified in his deposition that the Hospital's president instructed the vice president of each area to "achieve a dollar budget reduction" to address the this anticipated budgetary shortfall. (*Id.* at 67.) Jerry Felisi, Vice President of Finance, supposedly subsequently directed Hill to "look at reducing the number of managers" in his area, as "there were proportionally too many managers to non-managerial personnel." (*Id.* at 68.) Hill indicated that while Felisi decided that changes to reduce this imbalanced proportion were necessary, it was Hill's "decision on which individual it would affect." (*Id.*)

Hill decided in the middle of January 1990 that Pearlstein's position would be the one to be downgraded. On January 22, 1990, while she was still on leave, Pearlstein received a telephone call from Hill informing her that, for budgetary reasons, her position was being eliminated. Hill stated that since Pearlstein's "skills were so good," he wanted to offer her a non-managerial position as a financial analyst at the Hospital, earning thirty percent less income. (Pearlstein Dep. at 152.) Pearlstein did not accept this job offer.

---

**2.** In her 3(g) statement of material facts in dispute filed pursuant to Local Civil Rule 3(g) of the Eastern District of New York, Pearlstein fails to contest the claim of overlapping responsibilities contained in the Hospital's previously submitted 3(g) statement of undisputed facts. Local Civil Rule 3(g) provides that "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party." Since Pearlstein failed to controvert the Hospital's assertion in her 3(g) statement or elsewhere in her submissions to the Court, the existence of overlapping responsibilities will be deemed admitted for purposes of this motion. *See, e.g., DiCola v. SwissRe*

*Holding (North America), Inc.,* 996 F.2d 30, 31 (2d Cir.1993); *Maresco v. Evans Chemetics,* 964 F.2d 106, 111 (2d Cir.1992).

**3.** Pearlstein claims never to have been advised of this decision regarding her salary. The Hospital admits that Pearlstein was probably never informed.

**4.** Although the January 1990 Memorandum was written after Pearlstein was downgraded and therefore is somewhat self-serving, it is consistent with this sworn testimony from Hill's deposition.

Pearlstein, upset by the news that her position had been eliminated, telephoned the Hospital's President, Rick Varone, and the Personnel Director, Elliot Brook, both of whom Pearlstein claims were surprised that her position had been downgraded.

In addition to Pearlstein's position, the position of Director of Treasury, which also was within the Hospital's finance division, was eliminated, resulting in the laying off of a male employee. That employee was not offered a downgraded position. Amato and Thompson retained their positions as Budget Manager and Budget and Grants Coordinator, respectively. A woman was eventually hired for the non-managerial position that Pearlstein had been offered but refused.

Pearlstein filed a discrimination charge with the New York City Commission on Human Rights on June 12, 1990 and cross-filed with the Equal Employment Opportunity Commission (the "EEOC") on July 23, 1990. On April 28, 1992, Pearlstein received a right-to-sue letter from the EEOC and in July 1992, she commenced this lawsuit.

## DISCUSSION

■ A court may grant summary judgment when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether to grant a motion for summary judgment, a court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). A dispute as to a material fact is "genuine," and summary judgment is inappropriate, if, after resolving all factual ambiguities and drawing all reasonable inferences in favor of the nonmoving party, the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See Gallo v. Prudential Residential Serv. Ltd. Partnership,* 22 F.3d 1219, 1223 (2d Cir.1994) (citations omitted); *Lang v. Retirement Living Pub. Co., Inc.,* 949 F.2d 576, 580 (2d Cir.1991) (quoting *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510). Thus, "[i]f, as to the issue on which summary judgment is sought,

there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." *Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 37 (2d Cir.1994) (citations omitted).

■ The party moving for summary judgment bears the initial burden under Fed. R.Civ.P. 56(c) of demonstrating the absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Gallo,* 22 F.3d at 1223 (citations omitted); *Consarc Corp. v. Marine Midland Bank, N.A.,* 996 F.2d 568, 572 (2d Cir.1993) (citations omitted). If the non-moving party would bear the burden of proof on a claim at trial, the moving party may satisfy its burden by demonstrating an absence of evidence to support an essential element of such claim. *See Celotex Corp.,* 477 U.S. at 323–24, 106 S.Ct. at 2553. The non-moving party then has the burden of coming forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).

■ The plaintiff in a Title VII case always retains the ultimate burden of proving intentional discrimination. *St. Mary's Honor Ctr. v. Hicks,* —— U.S. ——, ——––––, 113 S.Ct. 2742, 2746–47, 125 L.Ed.2d 407 (1993); *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981). Nevertheless, in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973), the Supreme Court set forth intermediate shifting burdens of production. The plaintiff bears the initial burden of establishing, by a preponderance of the evidence, a prima facie case of discrimination. *McDonnell Douglas Corp.,* 411 U.S. at 802, 93 S.Ct. at 1824. Once the plaintiff has satisfied the elements of the prima facie case, a presumption of discrimination is created. *St. Mary's Honor Ctr.,* —— U.S. at ——, 113 S.Ct. at 2747; *Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094. The burden then shifts to the defendant to produce " 'through the introduction of admissible evidence,' reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of

the employment action." *St. Mary's Honor Ctr.*, —— U.S. at ——, 113 S.Ct. at 2747 (quoting *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093–94); *see also McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824. Once such a reason has been presented, the presumption of discrimination disappears and the burden again shifts to plaintiff to establish by a preponderance of the evidence, that " 'the proffered reason was not the true reason for the employment decision' . . . and that [gender] was." *St. Mary's Honor Ctr.*, —— U.S. at ——, 113 S.Ct. at 2747 (quoting *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095). "What this means in the summary judgment context is that the plaintiff must establish a genuine issue of material fact either through direct, statistical or circumstantial evidence as to whether the employer's reason for discharging her is false and as to whether it is more likely that a discriminatory reason motivated the employer to make the adverse employment decision." *Gallo*, 22 F.3d at 1225.

### I. *The Prima Facie Case*

■ The burden of establishing a prima facie case is not onerous. *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 986, 108 S.Ct. 2777, 2784, 101 L.Ed.2d 827 (1988) (quoting *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093–94); *Chambers*, 43 F.3d at 38; *Meiri v. Dacon*, 759 F.2d 989, 996 n. 10 (2d Cir.), *cert. denied*, 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985) (citation omitted). Where gender discrimination is alleged in the context of an employer's structural reorganization, the plaintiff must show that: (1) she belongs to a protected class,[5] (2) she was

qualified for the job, (3) she was terminated and (4) the termination occurred under circumstances giving rise to an inference of discrimination. *See McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824; *Maresco v. Evans Chemetics*, 964 F.2d 106, 110 (2d Cir. 1992) (citations omitted); *Rosen v. Thornburgh*, 928 F.2d 528, 532 (2d Cir.1991) (citations omitted); *Montana v. First Fed. Sav. & Loan Ass'n of Rochester*, 869 F.2d 100, 105 (2d Cir.1989). The Hospital does not dispute that Pearlstein has met the first three components of the prima facie case. The Hospital contends only that Pearlstein has no evidence to support the fourth element.

■ The Court concurs that Pearlstein has not, even when the evidence is viewed in a light most favorable to her, raised a genuine issue for trial regarding her satisfaction of the fourth prong of the prima facie case. "Circumstances contributing to a permissible inference of discriminatory intent may include the employer's continuing, after discharging the plaintiff, to fill that position, . . . or its invidious comments about others in the employee's protected group, . . . or the more favorable treatment of employees not in the protected group." *Chambers*, 43 F.3d at 37 (citations omitted); *see also Meiri*, 759 F.2d at 996 (stating that a prima facie case does not require plaintiff to show that she was replaced by person outside of protected class but merely that employer continued to seek applicants to fill the position). The transfer of a plaintiff's responsibilities to a worker not within the protected group or the failure to offer a plaintiff another available position for

---

**5.** Plaintiff asserts in her complaint that because of her gender and because she was on maternity leave at the time her position was downgraded, she belongs to two protected classes, that of women and that of women on maternity leave. Although the Court concurs that plaintiff falls within the protected class of women generally, the Court does not agree that plaintiff can claim discrimination based on being a woman on maternity leave. Title VII, as amended by the Pregnancy Discrimination Act of 1978, "does not protect people wishing to take child-rearing leaves as opposed to women seeking pregnancy leaves." *Record v. Mill Neck Manor Lutheran School for the Deaf*, 611 F.Supp. 905, 907 (E.D.N.Y.1985) (where action for discrimination was not cognizable when based on employee's seeking of child-rearing leave); *see also Barnes v.*

*Hewlett–Packard Co.*, 846 F.Supp. 442, 443–5 (D.Md.1994) (same); *cf. Barrash v. Bowen*, 846 F.2d 927, 931 (4th Cir.1988) (in holding that the denial of a breast-feeding leave did not give rise to a disparate impact claim, the Fourth Circuit stated that "[u]nder the Pregnancy Discrimination Act of 1978, . . . pregnancy and related conditions must be treated as illnesses only when incapacitating."). As Pearlstein adopted her child, her leave would not be a pregnancy leave protected under Title VII. Accordingly, for purposes of determining whether Pearlstein has raised a genuine issue of fact regarding her establishment of a prima facie case of discrimination, the Court may consider only whether she was discriminated against on the basis of her gender, and not whether discrimination resulted from her taking a maternity leave.

which she qualified are other relevant factors from which discrimination could be inferred. *Montana*, 869 F.2d at 105.

In the case at bar, Pearlstein has not argued, and the evidence does not show, that the Hospital kept Pearlstein's position open and sought applications from persons having qualifications similar to her own. Rather, the managerial position Pearlstein had filled was simply eliminated.

Nor does Pearlstein claim that the majority of her tasks were transferred to a male employee. Pearlstein and Amato may have had some overlapping responsibilities, but that overlap existed, according to the Hospital's undisputed 3(g) statement and Hill's deposition testimony, prior to the downgrading of Pearlstein's position. Pearlstein has not asserted or presented evidence that after she was downgraded, Amato assumed any, much less a significant portion, of the responsibilities that had once been hers. *Cf. Id.; Quarantino v. Tiffany & Co.*, 1994 U.S.Dist. LEXIS 15981, at *7–8 (S.D.N.Y. November 4, 1994) (where plaintiff alleged but court, as a matter of law, declined to find new higher level position was the same as plaintiff's eliminated job).

An inference of discrimination also cannot be drawn from the fact that the Hospital created a new lower level position of financial analyst to which most of Pearlstein's responsibilities were transferred. First, the lower level position was offered to Pearlstein. *Cf. Montana*, 869 F.2d at 105. Second, the position was filled eventually filled by another woman.

Nor is there other evidence that anyone outside the protected class, *i.e.*, a man, was given more favorable treatment in the restructuring of the budget and reimbursement department than Pearlstein received. Pearlstein could show favorable treatment towards male employees by presenting evidence that her qualifications were equal or superior to any male employee who was retained in a managerial capacity. *See Maresco*, 964 F.2d at 111 ("In the context of a consolidation or

reduction-in-force, where the employer is concededly engaged in a process that will legitimately result in the elimination of some positions, an employee must establish ... that 'he was qualified to assume another [available] position at the time of discharge.'" (citations omitted)); *Warner v. MCI Telcoms. Corp.*, 1994 WL 68226, at *3, 1994 U.S. Dist. LEXIS 2110, at *8 (S.D.N.Y. February 28, 1994). Pearlstein has not alleged, much less presented evidence, that she was qualified to assume another managerial position held by a male employee. According to Hill, Amato, whose job overlapped with Pearlstein's, had broader experience than Pearlstein, particularly in the area of Hospital grants. Pearlstein herself seems to acknowledge this fact by noting that Amato was in a "higher position" than she was. (Pearlstein Dep. at 134.)

The record reveals no other indication of disparate impact in the Hospital's restructuring of its finance division. Pearlstein's position was only downgraded while another fairly senior male employee, the Director of Treasury, was outright terminated. Thompson, a woman who had a managerial position parallel to Pearlstein, appears to have continued to serve as Budget and Grants Coordinator. Moreover, later in 1990, the finance division promoted another one of its female employees to a new managerial position.[6] Accordingly, this case is unlike *Maresco*, 964 F.2d at 113, an age discrimination case, where the employer's decision to terminate two of three older accounting employees, and none of twenty younger employees, was found by the Second Circuit to present circumstances giving rise to an inference of age discrimination sufficient to withstand a motion for summary judgment.

Moreover, there is no evidence that anyone made invidious comments about Pearlstein's status as a woman or that the Hospital held discriminatory attitudes towards women. Plaintiff attempts to demonstrate a discriminatory attitude towards women on the Hospital's part by pointing to the treatment of

---

**6.** Hill testified that he did not know that the new managerial position would be available at the time he informed Pearlstein that her position would be downgraded. Hill also indicated that the position required expertise in an area in which Pearlstein had no familiarity. Pearlstein has not alleged otherwise.

another female employee who twice allegedly had difficulty returning to work after a maternity leave. The testimony of this employee, Michelle Bonomo, is not, however, as useful to Pearlstein as she claims.

Bonomo did not seek to return to her full-time position after her first leave of absence. Rather, Bonomo sought to have a part-time position created for herself and before her leave began, "sort of worked it out" with her supervisor "that that's what it would be." (Bonomo Dep. at 17.) The Hospital, claiming a misunderstanding, informed Bonomo after she returned from leave that no part-time position was available. The Hospital offered, however, for Bonomo to work as a casual employee, with the same salary as she had when she had been a full-time employee, prorated for the hours that she worked, but with no benefits. Although the Hospital had no work for Bonomo in this capacity for five or six months, eventually, Bonomo began working on a consistent basis at the Hospital as a casual employee. Later, Bonomo's status was changed to part-time, allowing her the right to benefits. Given that Bonomo did not want her full-time position back and that the Hospital made an effort to accommodate her desire to work on less than a full-time basis, it is difficult to argue that Bonomo's situation in any way raises a triable issue regarding gender discrimination in plaintiff's case. Moreover, Bonomo's former full-time position was given to another woman.

Bonomo also testified that after a second maternity leave ending in April 1988, she was informed that her part-time position in the finance department had been upgraded to full-time status. She was told that if she were unable to work full-time, she would be able to assume one of two other part-time positions then available in the finance department. There is no indication that either of these part-time positions was at a lower salary; in fact, Bonomo testified that she may have even been paid more. Although Bonomo revealed that she was dissatisfied with having to change positions since she liked her prior tasks, Bonomo does not claim that the new work was of lesser quality.

As there is no indication that the Hospital's actions with respect to Bonomo were the result of gender discrimination any more than the consequence of legitimate business objectives and the employee's own preferences, the Court declines to find that this evidence in any way fosters a broad-based inference, sufficient to allow Pearlstein's claims to withstand summary judgment, that the Hospital generally treated its female employees in a discriminatory manner.

The case at bar is simply more akin to the facts of *DiCola v. SwissRe Holding (North America), Inc.*, 996 F.2d at 31–33, an age discrimination action where the employer asserted that a senior male employee's responsibilities diminished over time such that they were no longer commensurate with his salary. The Second Circuit Court of Appeals affirmed summary judgment in favor of the employer in that action, finding that the employer did not discriminate by terminating the senior employee and retaining another employee at an inferior position and lower salary since "[i]f a position's salary had been set at a level commensurate with certain job responsibilities and those responsibilities are subsequently diminished, an employer may make corresponding adjustments in positions and salaries regardless of the age of the employees involved." *DiCola*, 996 F.2d at 33 (citations omitted). In the case currently before the Court, the Hospital has asserted, and Pearlstein has not contested, that after the Merger, her responsibilities diminished and were no longer managerial in nature.[7] As Pearlstein has failed to present other facts, which, when viewed in her favor, establish a prima facie case of discrimination, the Hospital was free to institute a reduction in Pearlstein's salary and rank commensurate with her decreased responsibilities, even though she was a woman.

II. *Assertion of Legitimate Nondiscriminatory Reason*

 Assuming *arguendo* that Pearlstein's efforts to establish a prima facie case

---

7. Not only has plaintiff not disputed the fact that her responsibilities shrunk, but she has made no allegation that this shrinkage had anything to do with discrimination. Rather, plaintiff's complaint focuses only on discrimination in her termination.

of discrimination were sufficient to defeat summary judgment, the Hospital has offered a legitimate nondiscriminatory reason for Pearlstein's termination. The Hospital presented deposition evidence stating that Pearlstein was terminated as a result of a structural reorganization prompted by the Merger and a budgetary shortfall. A reduction-in-force is a legitimate nondiscriminatory reason to terminate an employee, see Montana, 869 F.2d at 105; Dister v. Continental Group, 859 F.2d 1108, 1115 (2d Cir. 1988), provided that the decision regarding who to terminate is not tainted by unlawful discrimination, see Maresco, 964 F.2d at 111. Accordingly, if Pearlstein had alleged facts to establish a prima facie case, this evidence of a legitimate reason for her discharge would be enough to rebut the resulting presumption of gender discrimination.

III. *Pretext*

 Assuming that Pearlstein had offered facts which, viewed in her favor, presented a prima facie case of discrimination, given the Hospital's articulation of a legitimate nondiscriminatory basis for eliminating her position, Pearlstein was required to produce, in order to avoid summary judgment, sufficient evidence creating a triable issue of fact on the question of whether the Hospital's reason was but a pretext for discrimination. "This may be demonstrated by reliance on the evidence that established her prima facie case, without any additional evidence being required, ... or by presentation of additional evidence to show that [defendant's] reasons for her discharge were false ..." *Gallo,* 22 F.3d at 1226 (citations omitted). Pearlstein is not required to show that gender was the only factor in the Hospital's decision to discharge her or that the proffered reason was false, but only that the stated reason was not the only reason for her discharge and that gender made a difference. *Montana,* 869 F.2d at 105.

 In addition to the other grounds raised by Pearlstein that the Court already considered in the context of reviewing whether she presented a prima facie case of discrimination, Pearlstein asserts that because the Hospital's president and personnel director did not know that her position had been downgraded, the Hospital's claim that her position was eliminated for budgetary reasons must be pretextual. Pearlstein points to Hill's testimony that the budgetary cuts were ordered during a meeting with the Hospital's president. Pearlstein implies that if in fact her position were downgraded as a result of budgetary cuts ordered at this meeting, the Hospital's president and personnel director would not have been surprised when she informed them of that fact. Pearlstein then makes the questionable logical leap that discrimination on Hill's part was the true reason she was terminated. In making this leap, Pearlstein ignores Hill's testimony that he was given the responsibility of selecting the employee whose position would be terminated. If one considers that testimony, the president's and personnel director's surprise would not reveal unauthorized action on Hill's part but only that these parties had not yet been informed of the results of the downsizing they had ordered.

In any event, the Court notes that Pearlstein's 3(g) statement fails to dispute the Hospital's 3(g) statement that "Hill was entrusted with the cutback decisions in the budget and reimbursement area." (Def. 3(g) Statement at ¶ 10.) This failure further renders specious Pearlstein's argument that because senior officials did not know that her position had been eliminated, a genuine issue of fact exists on the question of pretext.

Pearlstein also attempts to argue that because she did not know prior to her leave of absence that her position was targeted for elimination, the Hospital's actions must be the result of discrimination. Hill testified, however, that the Hospital's president did not hold the meeting at which budgetary cuts were ordered until the end of 1989, after Pearlstein had already commenced her leave of absence. Pearlstein acknowledged that once she began her leave of absence, she did not speak to her supervisors again until January 1990. She would therefore not have known of the cuts ordered in late 1989. Moreover, Hill testified, and Pearlstein has not contested, that typically it was not until late November of the year preceding the year for which a budget is being prepared

that the Hospital would have a "preliminary bottom line" to be used in determining whether budget cuts were necessary. (Hill Dep. at 31.) Accordingly, Pearlstein's claim that her lack of knowledge of the budgetary cuts raises a crucial issue for trial regarding pretext is likewise meritless.

By contrast, the Hospital has adduced evidence to support its asserted reason for choosing to downgrade Pearlstein's position. Hill testified that the Hospital considered the budget and reimbursement department of the Hospital's finance division to be overstaffed by managers and that the Hospital had already begun taking steps to address the problem. Hill also noted that Amato had broader experience than Pearlstein and that Pearlstein's responsibilities had decreased after the Merger. Pearlstein offers no evidence to counter any of these assertions.

With respect to the decreased salary of the financial analyst position that Hill offered Pearlstein, Hill testified that he based the reduction on a personnel department survey indicating that a financial analyst made about 30% less income than a manager. Pearlstein has not rebutted this testimony that the salary reduction was consistent with the changed position.

Pearlstein has simply failed to adduce any factual disputes that, viewed in a light most favorable to her, raise a material issue for trial on whether the Hospital's claimed business reasons for downgrading Pearlstein's position were a pretext for discrimination. In so concluding, the Court is mindful that summary judgment is ordinarily inappropriate in an employment discrimination suit where an individual's intent and state of mind are implicated. *Maresco*, 964 F.2d at 113 (citations omitted); *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir. 1989) (citations omitted). *Meiri*, 759 F.2d at 998 (citations omitted). "The summary judgment rule would be rendered sterile, however, if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion. Indeed, the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to commercial or other areas of litiga-

tion." *Meiri*, 759 F.2d at 998 (citation omitted). Accordingly, an employment discrimination case may be resolved on summary judgment where, as in this instance, genuine issues of material fact are lacking. *See, e.g., Dister*, 859 F.2d at 1117; *Meiri*, 759 F.2d at 998.

### CONCLUSION

Based on Pearlstein's failure to offer evidence sufficient to set forth a material issue regarding whether Pearlstein has established a prima facie case of gender discrimination or whether the Hospital's reasons for eliminating Pearlstein's position were pretextual, the Court grants the Hospital's motion for summary judgment.

SO ORDERED.