**Michele McNILL, Plaintiff,**

v.

**The NEW YORK CITY DEPARTMENT OF CORRECTION, Catherine Abate, Correctional Commissioner, and The City of New York, Defendants.**

**No. 93 Civ. 7217 (SHS) (HBP).**

United States District Court,
S.D. New York.

Nov. 27, 1996.

Eileen Helen Persky, Oceanside, NY, for Plaintiff.

Felicia Dunn–Jones and Paul A. Crotty, Corp. Counsel, City of New York, New York City, for Defendants.

### OPINION AND ORDER

PITMAN, United States Magistrate Judge:

## I. INTRODUCTION

Michele McNill, a New York City Department of Correction employee, brings this action against her employer and the City of New York, alleging that defendants discriminated against her in violation of the Pregnancy Discrimination Act by withdrawing certain benefits as a result of absences from June through November 1991. Plaintiff also alleges that defendants' actions deprived her of a property interest without due process of law.

Pursuant to 28 U.S.C. § 636(c), the parties have stipulated that this matter be referred to a Magistrate Judge for all purposes.

Defendants have moved for summary judgment. For the reasons set forth below, defendants' motion is granted and plaintiff's complaint is dismissed.

## II. FACTUAL CONTENTIONS

### A. Plaintiff's Pregnancy and Subsequent Leave

As set forth in the complaint and the papers submitted in connection with the pending motion, Ms. McNill began her employment as a Correction Officer with the New York City Department of Correction (the "Department") on March 21, 1983. In September 1990, Ms. McNill was hospitalized for two days due to complications in the early stages of her pregnancy. At the advice of her obstetrician and with the approval of her employer's Health Management Division (HMD), Ms. McNill stopped working to prevent a miscarriage and was placed on sick leave.

On April 19, 1991, Ms. McNill's son was born with a cleft palate and lip. Plaintiff contends that she had to breast-feed her son prior to his corrective surgery in September 1991 and for several weeks thereafter due to his medical condition (Plaintiff's Exh. A, McNill Affidavit at ¶ 8). Ms. McNill states that her absence for this period of time was "based upon the birth of [her] child and the life sustaining breast-feeding [she] was required to provide for him." (McNill Aff. at ¶ 13).

On June 13, 1991, Ms. McNill met with HMD physician Dr. George Lum for an assessment of her fitness to return to work. Dr. Lum concluded that Ms. McNill was physically fit to return to work, but should be evaluated for emotional problems (Defendants' Exh. 8).

About one month later, Ms. McNill was evaluated by Marsha Stern, an HMD psychologist. Ms. Stern's notes (Defendants' Exh. 7) of her July 1991 meetings with Ms. McNill state:

7/1/91: CO [Correction Officer] presents with sadness, tearfulness, sleep and appetite disturbance[s] related to marital separation and subsequent premature birth of son with cleft palate. Son is 2 mos. old and requires breast-feeding. He is scheduled for surgery on 7/16/91. CO has [history] of abusive relationship with alcoholic husband and has minimal support [illegible]. Suicidal/homicidal ideation denied. Substance abuse denied [illegible]. CO has referral for [counselor] from HIP. Documentation requested. She agrees to resume attendance at Alanon. Continue sick leave. Review three weeks.

7/29/91: CO reports additional medical problems with son resulting in delaying of surgery. She therefore has to continue breast-feeding. CO experiencing increased dysphoria[1] due to concerns re health and son. [Illegible] She is scheduled to see HIP counselor on 8/12. [Illegible] Discussed possible child care leave in future. Continue sick leave. Review 1 month.

---

1. Dysphoria: An emotional state marked by anxiety, depression, and restlessness. Webster's II New Riverside University Dictionary 413 (1994).

Ms. Stern determined that Ms. McNill should be placed on sick leave due to her emotional problems and asked her to submit documentation of her HIP Center treatment (Defendants' Exhs. 7, 9 at ¶¶ 10, 12).

Ms. McNill was evaluated on August 28, 1991, by Mr. Milton Smith, a HIP Social Worker who determined that Ms. McNill was having emotional and family problems but could return to full duty (Defendants' Exh. 10). This evaluation was not submitted to HMD until October 18, 1991, despite Ms. Stern's repeated requests at Ms. McNill's monthly follow-up visits (Defendants' Exh. 9, at ¶ 15). Ms. McNill's sick leave was continued by Ms. Stern based on her emotional problems—moodiness and unhappiness due to her son's health condition (Defendants' Exhs. 7, 9 ¶ 15). However, once Ms. Stern received the HIP evaluation, she removed Ms. McNill from sick leave and placed her temporarily on "medically monitored status", which limited her duties to tasks that did not require the supervision of inmates (Defendants' Exhs. 7, 9, at ¶ 17).

### B. *Plaintiff's Return to Work*

Ms. McNill returned to work on November 18, 1991.

In accordance with the collective bargaining agreement, covering Ms. McNill, uniformed employees of the Department of Correction such as plaintiff, are given unlimited paid sick leave (Defendants' Memorandum of Law at 2). To prevent abuse of this policy, employees who report sick for any reason except hospitalization, on twelve or more work days within a twelve month period are classified in "chronic absence Category B" for six months. This classification subjects them to the loss or revocation of "discretionary"[2] benefits such as assignment to a steady tour, access to voluntary overtime, promotions and secondary employment (Defendants' Exh. 13). Employees are given written notification when they are placed in Category B and may appeal that decision (*Id.*).

However, pregnancy related absences, defined by the Department as absences that occur when an officer is pregnant or as a result of the condition of being pregnant (Defendants' Exh. 14, XII), as well as a six-week maternity leave, (Defendants' Exh. 15) are not counted towards an employee's absentee status (Defendants' Exh. 16 at ¶ 1). Thus, pregnancy related absenteeism is not a factor in determining excessive absenteeism and will not result in a Category B classification regardless of length.

In determining Ms. McNill's absentee status, the Department excluded her absences during the period she was medically disabled due to pregnancy complications as well as her six week maternity leave (from September 1990 until June 17, 1991). Absences after June 17, 1991—the day her obstetrician determined she was medically fit to return to work—through November 18, 1991—the date Ms. McNill actually returned to work—were treated as regular sick leave, unrelated to her pregnancy, and resulted in Ms. McNill's being placed in Category B.

On January 20, 1992, Ms. McNill first learned of her Category B status when she was denied permission to take Martin Luther King Day as a paid holiday (McNill Aff. at ¶ 12, Defendants' Exh. 21). Ms. McNill appealed her Category B designation contending that her absence from June through November 1991 to breast-feed her child was pregnancy related and therefore, in accordance with the Department's policy, it should be excluded in determining her absentee status (Plaintiff's Exh. A, McNill Aff. ¶ 13). Her case was reviewed by Captain Rodriguez and Deputy Warden Lasser. Both recommended to Robert Wangerstein, Deputy Chief of Security, that Ms. McNill's appeal be denied due to her extensive absence history throughout her employment. Ms. McNill's appeal was denied on February 24, 1992 (Defendants' Exh. 25).

Ms. McNill continued to be sporadically absent throughout February 1992 (absent February 14, 19 and 25; Defendants' Exh. 29) and on March 2, Ms. McNill was given a corrective interview from Captain Rodriguez who reminded her of the importance of re-

---

**2.** Defendants' policy directive covering the consequences of excessive sick leave expressly refers to these benefits as "discretionary" (Defendants' Exh. 13 at Section V).

porting to work as scheduled (Defendants' Exh. 27).

On March 26, 1992, Ms. McNill was notified that her Category B status would continue for a minimum of six months from February 20, 1992 (Defendants' Exh. 31). Ms. McNill did not appeal this decision.

Ms. McNill's relatively high rate of absenteeism continued throughout the summer of 1992. Ms. McNill was absent approximately five times from June 30, 1992 through August 13th; several times she requested to be excused from duty without pay (Defendants' Exh. 34).

On August 20, 1992, the Department notified Ms. McNill that her Category B status would continue through at least February 15, 1993 (Defendants' Exh. 35). Again no appeal was taken by Ms. McNill. On September 28, 1992, according to Department records, Ms. McNill injured her hand and was placed on sick leave through February 9, 1993 (Defendants' Exhs. 29, 36, 38). Upon her return, she received an inferior post (Defendants' Exh. 38).

Ms. McNill challenges both her August 20, 1992 Category B placement and the inferior post she received upon returning to work in February 1993, contending that both adverse actions stem from her legitimate, pregnancy related absence from June through November 1991.

In support of her complaint, Ms. McNill claims that in October 1992, she was working at the Maritime Facility and was told by Warden Convoy that her assignment and schedule was adversely changed because of her absences from June through November 1991 (McNill Aff. at ¶ 18).

Ms. McNill seeks damages and injunctive relief, claiming that adverse actions taken by the Department after her return to work in November 1991, were discriminatory and related to her legitimate pregnancy-related absence from June through November 1991.

### III. ANALYSIS

#### A. Summary Judgment and Employment Discrimination

The standards applicable to a motion for summary judgment are well-settled and require only brief review.

"Summary judgment may be granted only when the moving party demonstrates that 'there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Allen v. Coughlin,* 64 F.3d 77, 79 (2d Cir. 1995) (quoting Fed.R.Civ.P. 56(c)); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The Court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor, and may grant summary judgment only when 'no reasonable trier of fact could find in favor of the nonmoving party.'" *Allen,* 64 F.3d at 79 (citations omitted) (quoting *Lund's, Inc. v. Chemical Bank,* 870 F.2d 840, 844 (2d Cir.1989)).

*Bass v. Chemical Bank,* No. 94 Civ. 8833, 1996 WL 374151 (S.D.N.Y. July 2, 1996).

The controlling principles for determining a summary judgment motion in a Title VII employment discrimination case, were cogently and concisely explained by Judge Leisure in *Sigmon v. Parker Chapin Flattau & Klimpl,* 901 F.Supp. 667, 676–77 (S.D.N.Y. 1995):

In a Title VII employment discrimination case, the plaintiff has the initial burden of establishing a prima facie case of discrimination. *See St. Mary's Honor Ctr. v. Hicks,* [509 U.S. 502, 506] 113 S.Ct. 2742, 2746–47, 125 L.Ed.2d 407 (1993); *Cronin v. Aetna Life Inc. Co.,* 46 F.3d 196, 203 (2d Cir.1995); *Chambers [v. TRM Copy Ctrs. Corp.,* 43 F.3d 29 (2d Cir.1994) ] 43 F.3d at 37. In order to defeat a motion for summary judgment, the showing the plaintiff must make as to the elements of the prima facie case is "de minimis." *See, e.g., Cronin,* 46 F.3d at 196; *Chambers,* 43 F.3d at 37. Through direct, statistical, or circumstantial evidence, the plaintiff must show: (1) that she is a member of a protected class; (2) that she was performing her duties satisfactorily; (3) that she was subjected to [an adverse employment decision]; and (4) that [the adverse employment decision] occurred in circumstances that give rise to an inference of discrimina-

tion based on her membership in a protected class. *See Chambers,* 43 F.3d at 37; *Rosen v. Thornburgh,* 928 F.2d 528, 532 (2d Cir.1991) (religious discrimination in violation of Title VII).

*See also McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). Once plaintiff has made the requisite *prima facie* showing of discrimination, the defendant bears the burden of introducing admissible evidence that shows that the employer's actions were legitimate and non-discriminatory. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 507, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993), *citing Texas Dep't. of Community Affairs v. Burdine,* 450 U.S. 248, 254–55 n. 8, 101 S.Ct. 1089, 1094 n. 8, 67 L.Ed.2d 207 (1981); *Quaratino v. Tiffany & Co.,* 71 F.3d 58, 64 (2d Cir.1995).

After defendant has articulated non-discriminatory reasons for its actions, the plaintiff must show that defendant's proffered reasons are merely pretextual. *See Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 36 (2d Cir.1994).

#### B. *The Prima Facie Case*

■ Plaintiff alleges that her employer violated the Pregnancy Discrimination Act by placing her in Category B as a result of her absences from June through November 18, 1991, thereby making her ineligible for certain discretionary benefits. Defendants contend that plaintiff does not have a valid claim under the Pregnancy Discrimination Act because plaintiff's absence from June through November 1991 was not due to pregnancy or any related condition covered by the Pregnancy Discrimination Act and that they are, therefore, entitled to summary judgment as a matter of law.

The Pregnancy Discrimination Act of 1978 ("PDA"), codified at 42 U.S.C. § 2000e(k), is a definitional amendment to Title VII. Congress enacted the PDA to include pregnancy-based discrimination in Title VII's prohibition of gender-based employment discrimination:

The terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work. . . .

■ In order to defeat defendants' summary judgment motion, plaintiff first must prove that there is at least a question of fact that she is a member of a protected class. Ms. McNill contends that she is protected by the PDA since her absences from June through November 1991 were pregnancy related because she had to breast-feed her son during that time.

■ For purposes of this motion, I assume the truth of plaintiff's contention that the malformation of her son's palate and lip required her to breast-feed him from June through November 1991. Thus, the issue presented is whether Ms. McNill's absence from work to breast-feed her child was an absence related to "pregnancy, childbirth or [a] related medical condition" within the meaning of the PDA. Based on the language of the PDA, its legislative history and the decisions from other courts interpreting the statute, I conclude that the condition of Ms. McNill's son is not within the scope of the PDA and, therefore, grant defendants' motion.

When read in conjunction with the balance of Title VII, the PDA prohibits discrimination based on "pregnancy, childbirth or related medical condition." Thus, the first question is, does the condition in issue fit within any of these terms. The dictionary defines "pregnancy" as "the period during which a developing fetus is carried within the uterus" (Webster's II New Riverside University Dictionary 928 (1994)). "Childbirth is defined as "parturition," "[t]he act of giving birth" (*Id.* at 255, 858). Malformation of the infant's palate and lip as a matter of logic, does not fit within either of the terms.

In addition, I cannot conclude that malfunction of the infant's palate and lip can be considered a "condition related to pregnancy or childbirth." Conditions related to preg-

nancy or childbirth would directly involve the condition of the mother. They would ordinarily be treated by an obstetrician or a gynecologist. An infant's malformed palate and lip does not directly affect the condition of the mother and would ordinarily be treated by a plastic surgeon and/or a pediatrician. It is even doubtful that the unfortunate condition here can fairly be characterized as a consequence of pregnancy. The fact that children are born without cleft palates and lips demonstrates that whatever biological mechanism is the cause of this unfortunate condition, it is *not* the condition of being pregnant.

Thus, the condition in issue here simply does not fit within the language of the PDA.

The PDA's legislative history also demonstrates that its coverage focuses on the medical condition of the mother—not the needs of the child:

[PDA] requires that women disabled due to pregnancy, childbirth or other related medical conditions be provided the same benefits as those provided other disabled workers.... [PDA] will not require an employer who does not provide disability benefits or paid sick leave to other employees to provide them for pregnant workers. This would include temporary and long-term disability insurance, sick leave, and other forms of employee benefit programs.... *The only time the employer will be required to allow pregnant workers to use this leave is during the time they are medically unable to work,* during the same period of time and under the same terms applicable to other employee[s]. For example, *if a woman wants to stay home to take care of the child, no benefits must be paid because this is not a medically determined condition related to pregnancy.*

H.Rep. No. 948, 95th Cong.2d Sess. (1978), reprinted, 1978 U.S.Code Cong. & Admin.News 4749, 4753 (emphasis added). *See also* Equal Employment Opportunity Commission Guidelines, 29 C.F.R. § 1604.18(A), App. (1995) (Interpreting the PDA).

Finally, several courts have dealt with similar situations and have uniformly held that conditions of the child that require the moth-

er's presence are not within the scope of the PDA. For example, in *Wallace v. Pyro Mining Co.*, 789 F.Supp. 867 (W.D.Ky.1990), *aff'd without opinion,* 951 F.2d 351 (6th Cir.1991), plaintiff sought an additional six-week leave of absence after the termination of her maternity leave. The reason for the request was "her inability to wean her child from breast-feeding. Her six-week-old infant refused a bottle and 'tenaciously insisted on breast-feeding, to the exclusion of all other food.'" 789 F.Supp. at 868. Plaintiff did not return to work when her physical disability ended and she was fired.

The District Court granted defendant's motion for summary judgment, stating:

Nothing in plaintiff's case states a claim under Title VII as amended by the Pregnancy Discrimination Act. Pyro's decision to deny her request for additional leave, assuming that such leave is a "condition of employment," was not because of her "pregnancy, childbirth or related medical conditions." It was based instead on Pyro's policy that breast-feeding would not be grounds for granting personal leave. This circumstance simply does not entitle plaintiff to the protections of the Pregnancy Discrimination Act.

Such a conclusion is mandated by the plain language of the act, and by its legislative history. While it may be that breast-feeding and weaning are natural concomitants of pregnancy and childbirth, they are not "medical conditions" related thereto. Admittedly, the act does not define what constitutes "related medical conditions." However, the substantive references to "related medical conditions" within that legislative history are all in the context of the extent to which female employees can be denied medical benefits, such as sick leave and health insurance coverage, arising from pregnancy and childbirth. Further, Congress' express intent was to codify pre-Gilbert [*General Electric Co. v. Gilbert*, 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976) ] EEOC guidelines that required "employers to treat disabilities caused or contributed to by pregnancy, miscarriage, abortion, child-birth and recovery therefrom as all

other temporary disabilities." H.R. No. 948, 95th Cong. 2, reprinted in 1978 U.S.Code Cong. & Admin.News, 4749, 4750 (emphasis added). We believe these factors indicate Congress' intent that "related medical conditions" be limited to incapacitating conditions for which medical care or treatment is usual and normal. Neither breast-feeding and weaning, nor difficulties arising therefrom, constitute such conditions.

We find further guidance from the following language: "[I]f a woman wants to stay home to take care of the child, no benefit must be paid because this is not a medically determined condition related to pregnancy." H.R. No. 948, 95th Cong. 5, reprinted in 1978 U.S.Code Cong. & Admin.News, 5, 4749, 4753. Nothing in the Pregnancy Discrimination Act, or Title VII, obliges employer to accommodate the child-care concerns of breast-feeding female workers by providing additional breast-feeding leave not available to male workers. If Congress had wanted these sorts of child-care concerns to be covered by Title VII or the Pregnancy Discrimination Act, it could have included them in the plain language of the statutes. It did not. It is not the province of this court to add to the legislation by judicial fiat.

789 F.Supp. at 869–70.

Similarly in *Barrash v. Bowen,* 846 F.2d 927 (4th Cir.1988), the Court of Appeals for the Fourth Circuit reversed a judgment for plaintiff based, in part, on her employer's denial of six months maternity leave to permit her to breast-feed her newborn child. The Court held that denial of discretionary breast-feeding leave did not provide a basis for a disparate impact claim nor did it give rise to a claim under the PDA.

And in *Barnes v. Hewlett–Packard Co.,* 846 F.Supp. 442 (D.Md.1994), the plaintiff sought to extend her maternity leave in order to take care of the unspecified medical needs of newborn twins. She was denied

this leave and claimed a violation of the PDA. Again, the employer's motion for summary judgment was granted, the Court stating, "However logical it may be to argue, as Barnes does, that parental leave following maternity leave is gender-based and thus protected under Title VII, that proposition has been consistently rejected from the outset." 846 F.Supp. at 443. *See also Fleming v. Ayers & Associates,* 948 F.2d 993, 996–97 (6th Cir.1991) (PDA "does not encompass adverse employment actions based upon the medical condition of a child simply because the child's condition is present at birth."); *Maganuco v. Leyden Community High School District 212,* 939 F.2d 440, 444 (7th Cir.1991); *Pearlstein v. Staten Island University Hospital,* 886 F.Supp. 260, 266 n. 5 (E.D.N.Y.1995). *See generally Fisher v. Vassar College,* 70 F.3d 1420, 1448 (2d Cir. 1995).

Admittedly, none of these cases are perfect analogues. In none of them was there a medical necessity that the child be breast-fed, a function which can only be performed by a newborn's mother. Nevertheless, there can be no issue that there are many children who suffer from serious birth defects and that for many of these children, their mother is, for all practical purposes, absolutely essential to their survival. If plaintiff's claim here is covered by the PDA, then a multitude of mothers who have left work involuntarily to attend to their children's medical needs would also have claims[3]. I am unwilling to infer that Congress intended such a broad expansion of the scope of Title VII from the fairly narrow language of the PDA.

The PDA only provides protection based on the condition of the mother—not the condition of the child. As sympathetic as Ms. McNill's situation is, she is not a member of a protected class and therefore cannot make out a *prima facie* case for a Title VII action. Accordingly, defendants' motion for summary judgment on this claim is granted.

---

**3.** Although it might be argued that the birth defect in this case is different from other birth defects because only the mother can provide the intervention necessary to the child's survival, I do not find that to be a convincing distinction. Although a cleft palate and lip are not trivial problems, there are a host of other birth defects that are far more serious. To permit coverage here and deny in these other more serious cases, would draw an arbitrary distinction that is not anywhere supported in the PDA's legislative history.

## C. *Plaintiff's Due Process Claim*

■ Defendants next contend that they are entitled to summary judgment on plaintiff's due process claim because plaintiff has no property interest in the employment benefits in issue and even assuming she did, plaintiff was not deprived of the procedural due process legally required. Plaintiff alleges in her complaint that defendants have wrongfully deprived her of a property right in public employment granted to her by New York State's Civil Service Law § 75. Inexplicably, plaintiff's opposition papers to defendants' motion papers do not even address defendants' motion for summary judgment dismissing plaintiff's due process claim; plaintiff offers no legal or factual argument in opposition whatsoever.

In analyzing plaintiff's second claim, it is important to bear in mind the specific incidents of employment in issue here. Plaintiff does not contend that she has been terminated, constructively terminated nor does she allege she has been demoted or that her base salary has been reduced. To the contrary, the record affirmatively establishes that plaintiff continues to work as a Correction Officer, currently assigned to Maritime Facility III at Rikers Island (McNill Aff. at ¶ 18). Rather, the deprivation at issue here are fairly subtle changes in the conditions of plaintiff's employment. For example, as a result of being placed in Category B, Ms. McNill lost preference as to when she could take her vacation time, her preference as to what holidays she could take, her assignment to a steady tour and post and access to voluntary overtime (Comp. ¶ 16, Def.Exh.13 at Section V). Plaintiff does not allege that she lost earned vacation time, paid holidays or earned overtime pay. Indeed, the record affirmatively discloses that Ms. McNill regularly took vacation time throughout the period of her dispute with defendants (Defendants' Exh.29). Defendants' 3(g) statement characterizes these lost advantages as "discretionary benefits" (Defendants' 3(g) Statement at ¶¶ 24–25). In response, plaintiff states that she "[a]dmits the assertions as set forth in paragraphs 24 [and] 25 ... of defendant's 3(g) statement" (Plaintiff's 3(g) Statement at ¶ 12).

■ To state a cognizable claim for a violation of procedural due process, a plaintiff must allege facts demonstrating that the government deprived plaintiff of a protected property interest without constitutionally adequate procedures. *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 541, 105 S.Ct. 1487, 1492, 84 L.Ed.2d 494 (1985). "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must instead have a legitimate claim of entitlement to it." *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 576, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). A legitimate claim of entitlement to a benefit may be derived from state laws or understandings that support claims of entitlement to certain benefits. *Roth*, 408 U.S. at 577, 92 S.Ct. at 2709.

■ Thus, in analyzing a procedural due process claim, the Court must first determine whether the plaintiff has a property interest protected by the Constitution. *See Roth*, 408 U.S. 564, 92 S.Ct. at 2702–03; *Narumanchi v. Board of Trustees*, 850 F.2d 70, 72 (2d Cir.1988), *cert. denied*, 502 U.S. 909, 112 S.Ct. 302, 116 L.Ed.2d 246 (1991). If a protected interest is identified, the Court must next determine whether the government deprived the plaintiff of that interest without providing the constitutional minimum due process. *See Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); *Narumanchi v. Board of Trustees, supra*, 850 F.2d at 72.

■ "A public employer enjoys wide latitude in managing its office...." *White Plains Towing Corp. v. Patterson*, 991 F.2d 1049, 1057 (2d Cir.), *cert. denied*, 510 U.S. 865, 114 S.Ct. 185, 126 L.Ed.2d 144 (1993). Accordingly, the due process clause does not protect trivial aspects of the public employee's relationship with her employer. *See Ezekwo v. NYC Health & Hospitals Corp.*, 940 F.2d 775, 782–83 (2d Cir.), *cert. denied*, 502 U.S. 1013, 112 S.Ct. 657, 116 L.Ed.2d 749 (1991).

Interests similar to those in issue here have been considered by numerous courts and have consistently been found to be too

insubstantial to warrant the protection of the due process clause. *Altman v. Hurst,* 734 F.2d 1240 (7th Cir.), *cert. denied,* 469 U.S. 982, 105 S.Ct. 385, 83 L.Ed.2d 320 (1984) (police officer has no interest protectable by due process clause in job assignment, overtime opportunities and vacation date); *Brown v. Brienen,* 722 F.2d 360 (7th Cir. 1983) (deputy sheriff not permitted to take accrued compensatory time on the date previously promised; no protectable property interest found); *Lewandowski v. Two Rivers Public School District,* 711 F.Supp. 1486, 1495 (E.D.Wis.1989) ("mere transfers and reassignments have generally not been held to constitute a constructive discharge or to implicate a constitutionally protected property interest"); *Demuro v. Westchester County Department of Corrections,* No. 85 Civ. 4708, 1986 WL 10728 (S.D.N.Y.1986) (correction officer's denial of access to commissioner, denial of "choice" assignments and denial of vacation leave does not implicate interests protected by due process clause); *Rode v. Dellarciprete,* 646 F.Supp. 876, 880 (M.D.Pa. 1986), *vacated in part on other grounds,* 845 F.2d 1195 (3rd Cir.1988) ("personnel decisions short of termination do not constitute deprivations of a property interest under the Fourteenth Amendment"); *Wargat v. Long,* 590 F.Supp. 1213, 1215 (D.Conn.1984) (decision involving state troopers "transfer [with loss of pay] from one position to another and the failure to promote him ... are not of a magnitude requiring the plaintiff's employer to afford him due process of law.")

As stated by Judge Lowe in *Demuro v. Westchester County Department of Corrections, supra,* No. 85 Civ. 4708, 1986 WL 10728 at *3:

> A deputy sheriff asks his boss for permission to take next Friday off to do some shopping. The boss not only agrees but solemnly promises that he will let the deputy have the afternoon off. But when Friday rolls around he changes his mind. The deputy is bitterly disappointed, and conceivably he might have some administrative or even judicial remedy under state law. But the Constitution must not be trivialized by being dragged into every personnel dispute in state and local government. Disputes over overtime, over work assignments, over lunch and coffee breaks do not implicate the great objects of the Fourteenth Amendment.

■ Finally, even if the rights involved were more substantial, Ms. McNill has conceded, and the evidence shows, that the benefits involved were discretionary benefits. As such, Ms. McNill cannot claim a protectable property interest in them. *Schwartz v. Mayor's Committee on the Judiciary,* 816 F.2d 54, 56 (2d Cir.1987).

Since the overwhelming weight of authority holds that the interests in issue here are neither protectable liberty or property interests, defendants' motion to dismiss Ms. McNill's due process claim must also be granted.

## IV. CONCLUSION

The record here demonstrates that Ms. McNill has probably been dealt more than a fair share of life's tribulations; she had a difficult pregnancy followed by the birth of a child whose survival required daily attention. These demands were, no doubt, exacerbated by the difficult family situation reflected in the notes of her psychologist. As sympathetic as Ms. McNill's plight is, however, the law simply does not require that defendants compensate her for the injury alleged here.

Accordingly, defendants' motion for summary judgment is granted in all respects and plaintiff's complaint is hereby dismissed.

SO ORDERED.